# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## November 18, 2025 Session

## STATE OF TENNESSEE v. CHARLIE RICHARD MARTINEZ

**Appeal from the Criminal Court for Knox County**
**No. 118598     Steven W. Sword, Judge**

_____

**No. E2024-01050-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Charlie Richard Martinez, of first degree felony murder, especially aggravated robbery, and unlawful possession of a firearm by a convicted felon. Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus four years. On appeal, the Defendant argues: (1) the evidence is insufficient to sustain his convictions; (2) the trial court abused its discretion in admitting three different writings attributed to the Defendant as autobiographical rap lyrics; (3) the trial court committed plain error in allowing the State to amend the especially aggravated robbery count the morning of trial; (4) the trial court erred in allowing Kendra Ivey to testify to double hearsay; (5) the trial court abused its discretion in denying his Specific Discovery Request No. 1, which requested materials necessary for his state-funded expert; and (6) the cumulative effect of these errors deprived him of a fair trial. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and MATTHEW J. WILSON, J., joined.

Chelsea C. Moore (at sentencing and on appeal), and Kit Rodgers (at trial), Knoxville, Tennessee, for the appellant, Charlie Richard Martinez.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Cameron Williams, Jordan Murray, and Jodie Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In February 2021, the Knox County Grand Jury charged the Defendant with three counts of first degree felony murder (Counts 1, 2, and 3), one count of first degree premeditated murder (Count 4), one count of especially aggravated robbery (Counts 5), one count of aggravated burglary (Count 6); one count of employment of a firearm during the commission of a dangerous felony (Count 7); two counts of tampering with evidence (Counts 8 and 9), and one count of unlawful possession of a firearm by a convicted felon (Count 10). Prior to trial, the State dismissed all counts except for one count of first degree felony murder (Count 1), the count of especially aggravated robbery (Count 5), and the count of unlawful possession of a firearm by a convicted felon (Count 10).

Prior to trial, the Defendant filed a motion in limine seeking to exclude, on authentication and Tennessee Rule of Evidence 403 grounds, certain rap lyrics attributed to him that were found in two notebooks at the scene of his arrest and in certain documents seized during a search of the Defendant's jail cell. Following a hearing, the trial court denied the motion in limine, finding that the writings were sufficiently authenticated and that the lyrics "appear[ed] to be . . . biographical in nature and seem[ed] to be about the current charges." Accordingly, the trial court found that the lyrics were relevant, were highly probative of the Defendant's involvement in the crimes at issue, and were not unfairly prejudicial.

**Trial.** Patsy Letner, the mother of the victim, Victor Daniel Letner, testified that the last time she saw the victim was around 10:00 p.m. on February 7, 2021. The next morning, the victim's red Chevrolet Blazer was gone. A few days later, the police notified her that the victim's deceased body had been found.

Investigator Charles Crothers with the Rockwood Police Department testified that he completed a missing person report for the victim. He tracked the victim's cell phone, which showed that the victim had traveled on Interstate 40, had taken the Westel Road exit, and had driven to the Strawberry Plains exit in Knox County. Investigator Crothers said the victim's mother informed police that the victim told her he was going to Knoxville to meet a woman he met online before he disappeared. Investigator Crothers disclosed that he personally knew the victim, whom he described as "developmentally delayed." He said the victim was "childlike," "liked video games," and "kept to himself."

On cross-examination, Investigator Crothers stated that he shared the tracking information from the victim's cell phone with other law enforcement agencies.

On redirect examination, Investigator Crothers said that during the investigation, he talked to Deputy John Fischer with the Knox County Sheriff's Office, who attempted to locate the victim's red Chevy Blazer. Investigator Crothers stated that the victim's cell

phone was tracked to a hotel near the Strawberry Plains exit. From there, the victim's phone traveled down some back roads to an area with some old farmhouses.

On recross-examination, Investigator Crothers confirmed that after the victim's cell phone went to the hotel near the Strawberry Plains exit and then traveled along some back roads, and the victim's phone returned to the hotel near the Strawberry Plains exit.

Detective Donnie Clift with the Knox County Sheriff's Department testified that he became involved in the victim's case when Detective Steven Ballard notified him of an address on Kodak Road where the victim might be located. Detective Clift went to the home at 7048 Kodak Road, and when no one answered the door, he looked in the window and saw a person lying on the floor. He and other officers entered the home and determined that the person lying on the floor was the victim, who was deceased. He notified Detective Ballard that they had found the deceased victim. He also observed that there was blood and shell casings on the floor near the victim's body.

Kendra Ivey testified that for the past two years, she had resided at a detention facility in Knox County. Ivey explained that the morning prior to the Defendant's trial, she entered a plea of guilty in this case to facilitation to commit first degree felony murder "with an underlying charge of theft" and received a sentence of fifteen years to serve in the Tennessee Department of Correction. She stated that she would have to serve thirty percent of this fifteen-year sentence before she would be considered for parole, and she acknowledged that parole was not guaranteed. Ivey admitted that she was originally charged with first degree murder of the victim, which carries a sentence of life imprisonment and that she agreed to testify truthfully at the Defendant's trial in exchange for her fifteen-year sentence.

Ivey admitted that she "took the victim to be robbed by the [D]efendant" and understood that although she did not pull the trigger, she still committed first degree felony murder. She acknowledged that she had previously been convicted of crimes of dishonesty because she was convicted of forgery and theft in 2016, and theft of identity without consent in Kentucky in 2018. She stated that she committed these crimes to fund her heroin and methamphetamine addiction. She also said she "prostitute[d] [her]self for drugs and money."

Ivey said she knew the victim through one of her mother's friends and had known the victim since she was eleven years old. She first met the Defendant a few weeks prior to the victim's murder when she was living at a hotel. She and the Defendant had sex and took methamphetamine. The Defendant told Ivey he wanted to rob someone, and because the victim had messaged Ivey in the past about wanting to have sex with her, Ivey contacted the victim while she was staying at the Econo Lodge at Strawberry Plains. Ivey admitted the Defendant's only connection to the victim was through her. When Ivey and the Defendant

- 3 -

discussed robbing the victim, the Defendant had what Ivey believed to be a .45 caliber handgun. Ivey said that the plan was to tell the victim that she would charge $100 for sex. She believed that when they robbed the victim, the victim would hand over the money he had. She said the plan was to take the victim to a vacant house suggested by the Defendant. She said that although she assumed that the Defendant would have his gun during the robbery, she did not believe the Defendant would use his gun against the victim.

Ivey asserted that she contacted the victim through Facebook Messenger and had him come to her room at the Econo Lodge. The victim arrived at her hotel room that night and gave her $40 up front, although she claimed she did not engage in any sexual acts with him. Ivey said that although the victim attempted to kiss her, she brushed him off and continued to do shots of methamphetamine to "buy time." While the victim was in her hotel room, Ivey communicated with the Defendant via Facebook Messenger. She claimed she told the Defendant that the victim was getting "on [her] nerves" and she was about to "get rid of him and bring him to [the Defendant]." After a few hours, Ivey and the victim drove in the victim's red Blazer to the vacant house on Kodak Road that the Defendant suggested. She convinced the victim to take her to this home, which did not look abandoned from the outside, so she could get some clothes. Ivey admitted that she lied to police on February 17, 2021, when she claimed she told the victim she wanted to buy drugs at the Kodak Road house.

Ivey said that when she and the victim arrived at the house, the Defendant approached the Blazer on the driver's side and asked Ivey and the victim if they wanted to come inside, and they exited the vehicle and entered the home with the Defendant. They walked into the living room, and the Defendant pulled out his .45 caliber gun and fired a shot close to the victim's head, but this shot did not hit him. After this, the victim attempted to grab the gun from the Defendant's hand, and the Defendant fired two more shots. One of these shots hit the Defendant's right thigh, and the other shot hit the victim. Ivey said that after this happened, she went outside and smoked a cigarette. She admitted she did not call the police. A few minutes later, the Defendant limped outside and told Ivey to get the keys to the victim's Blazer. Ivey went inside, grabbed the victim's keys, returned to the Blazer, and drove she and the Defendant to the Defendant's mother's home, which was a couple of minutes away. When she went inside the home, the victim was alive but making a "gurgling" sound. She agreed that she did nothing to help the victim. When she and the Defendant arrived at the Defendant's mother's home, the Defendant's mother, Diane Jeanty; the Defendant's sister, Jayda Martinez; and Jayda's boyfriend, Jordan Franklin, were present. Ivey parked the victim's car behind Diane's home, and she and the Defendant made their way inside. When Diane, Jayda, and Jordan asked them what happened, the Defendant said that someone had tried to rob him, that he had gotten shot, and that he had been forced to shoot the robber. Ivey clarified that the victim had never tried to rob the Defendant. She said that she never saw the victim with a firearm that day and had never seen the victim

- 4 -

carrying a firearm before. Ivey confirmed that the Defendant's claim that he was robbed was not true.

Ivey asserted that they did not take the Defendant to the hospital for his gunshot wound; instead, Diane tended to the Defendant's wound, which was bleeding, at her house. A short time later, Ivey and Jordan took the victim's car and went back to the abandoned house on Kodak Road because the Defendant had told them to wipe down anything that they possibly touched to get rid of their fingerprints or DNA and to collect the victim's phone.

Ivey obtained long rubber cleaning gloves and a rag with a chemical on it from Diane's home, and once she and Jordan returned to vacant house on Kodak Road, she wiped the doorway, the door handle and doorknob on the back door, and the kitchen counter. Then she and Jordan approached the dining room area and saw the victim lying on the floor. Ivey said she could not touch the victim, so Jordan got the victim's cell phone out of his pocket. At the time, Ivey assumed the victim was dead, and she did not see him breathing. After she wiped down surfaces and Jordan got the victim's cell phone, they took the victim's Blazer back to Diane's home. Once there, Ivey gave the victim's cell phone to the Defendant, and Diane suggested that they burn the clothes they had been wearing, even though the Defendant falsely claimed that he had been robbed and that he had been forced to shoot the robber. Ivey observed the Defendant deleting some information from the victim's phone, which was not password protected, and then the Defendant asked Jordan and Jayda to take the victim's cell phone and the Defendant's gun and dispose of them in "a body of water" near Diane's home. Ivey also stated that the Defendant went through her phone and deactivated her Facebook account.

Ivey saw Jordan and Jayda leave with the victim's phone and the Defendant's gun, and she assumed that they threw both of these items in the body of water as the Defendant directed. Ivey confirmed that she never saw the victim's phone or the Defendant's gun after that point. She acknowledged that no one at Diane's home suggested that they call the police. Ivey said Diane later burned Ivey's and the Defendant's clothes in her outdoor fire pit. Ivey also wiped out the victim's car and went through the belongings in it. Although the Defendant rode to his mother's home in the passenger seat of the victim's car, Ivey did not observe any blood inside the car from the Defendant's gunshot wound.

Ivey stated that Jordan and Jayda left with the victim's cell phone and the Defendant's gun and returned to Diane's home a few minutes later. In the meantime, Diane contacted some family members that lived in New Jersey, and Diane, the Defendant, and Ivey agreed to drive the victim's Blazer to New Jersey. Once Jordan and Jayda returned from disposing the cell phone and gun, Jordan took Ivey in Diane's truck back to Ivey's room at the Econo Lodge to get her belongings and to get her $100 deposit back. Ivey then

took an Uber back to Diane's home. She then put her things in the victim's Blazer, and she, the Defendant, and Dinae left in that vehicle, headed to New Jersey.

Ivey said that although she told police that she and the Defendant divided up the $40 that the victim had given her, she actually kept the $40. On the way to New Jersey, they stopped at a hotel for one night in either Virginia or West Virginia, and Ivey got a hotel room in her name. The next day, they drove to Newark, New Jersey, where they stayed for a couple of weeks with the Defendant's cousins. While in Newark, the Defendant submerged her cell phone in a cup of water because the Defendant was "paranoid." Ivey then borrowed Diane's cell phone to call her family, telling her mother and grandmother that she was in Florida trying to "get clean" from drugs and that she would be home soon. She stated that even though the Defendant had been shot, he never went to a hospital for his injury. Instead, the Defendant's cousin gave him a Percocet and removed the bullet in his leg with a razor blade and tools from a blackhead kit. She believed the Defendant's cousin threw the bullet away. Ivey said they spray-painted the victim's Blazer black while in New Jersey because they assumed the police would be looking for it. Although they talked about burning the victim's vehicle, they never did that. After a few days, Ivey and Diane returned to Knoxville in the victim's Blazer. Although the Defendant submerged her cell phone in water, Ivey took her phone with her when they left New Jersey.

When Ivey was asked why she and the Defendant went on the run and then returned to Knoxville, Ivey replied:

> My sister had said that she had ran into Jordan and Jayda and they had told her that me and [the Defendant] had shot somebody, killed somebody and we had to leave town. So we then called Jordan and Jayda. They denied that they ever said that. So from that point on, we decided that we needed to come back to Tennessee to see what everybody knew or—get to the bottom of what was really go[ing on and] try to ease everything out[.]

Ivey acknowledged that she was trying to cover up the victim's murder because people were talking about it. She noted that they stopped in Virginia or West Virginia for one night on the way back.

Ivey said that Jayda was supposed to come pick them up and bring them back to Tennessee because they did not want to drive the victim's Blazer back there, but Jayda refused to come get them. Ivey ended up calling her sister, Kendall, and her ex-girlfriend, Anna, who picked Ivey and Diane up from the hotel in Virginia or West Virginia and drove them back to Knoxville. When they arrived, Kendall drove them to a gas station where Jayda worked, so Diane could get her truck and pick up the Defendant back at the hotel room in Virginia or West Virginia. Ivey said she needed to leave with Kendall and Anna

to see what they knew and told Diane that she needed to pick up the Defendant and then figure out what Jordan and Jayda and her family knew so they could decide where to go and what to do. Ivey said that when she returned to Knoxville, she put her phone in a bag of rice to see if she could get it to work again. Ivey identified a photograph of her phone in a bag of rice.

On February 17, 2021, Ivey said that she was pulled over by Officer Fischer when she was returning from the Maryville area. She was taken into custody. Ivey later spoke with Detective Ballard at the Knox County Jail. Ivey said she waived her Miranda rights and gave a recorded statement to Detective Ballard. She acknowledged that the majority of her recorded statement was a lie because she was "scared" and "trying to put [her]self as far away from the truth of what happened" so she could "go home." Ivey admitted that if she did not tell the truth during her trial testimony, she would be "tried for all [her] original charges and go to prison for life."

Ivey stated that while she was on the run with the Defendant, she had only known the Defendant for a week or two. Although she did not know the Defendant very well, she knew he liked to rap. Ivey acknowledged that she had lived on the streets and knew what "street lingo" was. She asserted that "[t]hey want me for a body," meant that "you're wanted for murder." She also said that "[c]atch a body" meant "you killed somebody." In addition, she said "[k]eep it solid" meant "don't tell, don't fold." When Ivey was asked if Jayda and Jordan were "keeping it solid" while they were away, Ivey said she was not sure she was under the impression that they were not "keeping it solid." Ivey also stated that "[o]n the run" meant "you're wanted by the police" and "[o]ut there thugging" meant "you're out there in the streets just living a lifestyle of money, drugs and guns." Ivey also asserted that "rob" meant "to take something from somebody" and "a plug" meant "a drug dealer." She explained that if someone said "I'm going to rob a plug," that meant that "[y]ou're going to go take what drugs and money he has." She added that "clutching on heat" meant "[y]ou have a gun." Ivey said that "Glock" was a "type of gun" and "hot 9" meant a "9 millimeter" gun.

On cross-examination, Ivey admitted that she lied when she told the officers that the victim agreed to get more money from an ATM and then turned the wrong way when leaving the hotel, which made her concerned. She said she told this lie to make it appear that the victim was threatening her. Ivey acknowledged that she, not the Defendant, communicated with the victim and that the victim would not have driven to Knoxville if she had not communicated with him that night. Ivey also admitted that she did not initially tell the police that she went into the vacant house on Kodak Road or saw the Defendant shoot the victim until she talked to the prosecutor to prepare her testimony for this trial. She claimed that she told the prosecutor about seeing the Defendant shoot the victim before she had an agreement about her plea. Ivey acknowledged that she started blaming the Defendant

- 7 -

for the shooting when officers began asking questions about her whereabouts on the night of the shooting.

Ivey admitted that she drove the victim's Blazer away from the vacant Kodak Road house after the shooting. She also admitted that she drove the victim's Blazer part of the time when they traveled back and forth to New Jersey.

Bruce Wiggleston testified that he lived at 6948 Berry Lane and that one year earlier, the house at 6944 Berry Lane was rented by a lady named "Diana." He said that Diana lived in the home near him for two years and moved away in the spring of 2021. Wiggleston confirmed that the home at 7048 Kodak Road was vacant and was located approximately 400 to 500 yards from his home. In February 2021, Wiggleston had a Ring camera for security at his home, which captured footage of what was happening in the backyard of 6944 Berry Lane.

Wiggleston stated that the police approached him about whether he noticed any activity in the backyard of 6944 Berry Lane. He acknowledged that there had been a large, smoky fire in the firepit and a red Chevrolet or GMC truck visible at the 6944 Berry Lane address. He could not recall whether the truck had a camper top on the truck bed or how long it was parked there. At the time of the fire, he could tell there was movement in Diane's backyard, but he could not tell who it was. When the police asked him if he noticed any activity at 6944 Berry Lane, Wiggleston reviewed his security footage and stated that on February 8, 2021, at 9:38 a.m., his Ring camera captured footage of a person in Diane's backyard, the red truck parked there, and a substantial amount of smoke coming from the fire in Diane's firepit. On February 8, 2021, at 11:02 a.m., his Ring camera captured footage showing that the red truck was still parked in Diane's backyard. Wiggleston also identified still shots from the security footage, which depicted someone with long hair falling just below the shoulders, the red truck, and the smoke. He said that in one of these still shots, the hood of the truck was up. Wiggleston said he had never seen the red truck at Diane's property before February 8, 2021.

On cross-examination, Wiggleston admitted that he did not see who drove the red truck that was parked at 6944 Berry Lane.

Megan Queener, the forensic services technician for the Knox County Sheriff's Office from 2014 to 2022, testified that on February 17, 2021, she processed the crime scene at the vacant house at 7048 Kodak Road. She found a projectile in the room with the fireplace. She also found a projectile and a hole in the wall in one of the rooms. In the room with the staircase, she found a wallet, two bullet casings, and a hole in the door. The victim's deceased body was in the dining room, and there was a defect in the wall a few feet above the victim's body. In addition, there was a reddish brown substance, believed to be

blood, near the victim's body, which she swabbed and collected. She also found reddish brown stains in the kitchen and the smaller sunroom.

Queener also went to the home at 6944 Berry Lane on February 18, 2021, to process the scene there. Inside, she found a suitcase with some personal belongings that had a suspicious red stain on them. She also found a driver's license and social security card for Diana Jeanty. In addition, she found a first aid kit and a cell phone in one of the bedrooms. In another bedroom, she found a carrying case for 9-millimeter firearm and a blue duffel bag, with a cell phone inside, on the bed. There was also another cell phone inside a drawer in that bedroom. In the backyard of this residence, she saw tire tracks and a fire pit. Queener stated that Detective Ballard later gave her a bag of rice that contained a cell phone inside.

Queener also processed the scene at a trailer at 2804 Rifle Range Road on February 26, 2021. She collected a green marker and a white Reporter's Notebook from the living room. She also found a backpack with a first aid kit and a wallet with a credit card bearing Diana Jeanty's name. In addition, she collected two cell phones from this residence. In the back bedroom, she found either alcohol or hydrogen peroxide and a green Composition Notebook. There was also a white Ford Ranger truck parked outside this residence. She photographed the pages of the Reporter's Notebook and the green Composition Notebook, which both contained writing in green ink that was consistent with the green marker she collected. She stated that neither of these notebooks was tested by the Tennessee Bureau of Investigation (TBI).

On February 19, 2021, Queener processed the 1989 Chevy Blazer that had both black and red paint on it. Inside this blazer, she found a Tennessee insurance card and a vehicle registration bearing the names of Patsy and Leonard Letner. She also collected a small cigarette butt from the Blazer's backseat. On February 26, 2021, Queener went to the University of Tennessee Medical Center to take photographs of the Defendant, who had sustained an injury to his right leg. On March 19, 2021, Queener processed the white Ford Ranger truck, which had a title bearing the name of Diana Jeanty.

Special Agent Forensic Scientist Kim Lowe testified that she worked for the TBI in the forensic biology unit and was accepted as an expert in the field of forensic biology. Special Agent Lowe stated that she received three DNA standards from the victim, Ivey, and the Defendant. She determined that several of the swabs of reddish brown stains on the floor of the Kodak Road house matched the victim's DNA. In addition, the DNA on the wallet found at the Kodak Road house was consistent with the victim's DNA. None of the items collected from the Kodak Road house tested positive for the Defendant's or Ivey's DNA. The pants collected from the Berry Road house presumptively tested positive for blood, and the DNA from reddish brown stains on these pants matched the Defendant's DNA. However, the major contributor of the DNA from the waistband of the pants was

from an unknown female individual. In the Chevy Blazer, the leather handle on the passenger side of the Blazer contained DNA that was consistent with Kendra Ivey's DNA. The DNA from the driver's seat adjustment lever was consistent with the Defendant's DNA. In addition, the DNA from the cigarette butt from the backseat of the Blazer matched the Defendant's DNA.

Sergeant Brian Dalton, a supervisor of the forensic unit of the Knoxville Police Department, was accepted as an expert in the field of toolmark and firearms examinations. He determined that the two Hornady .45-auto cartridge cases collected from the vacant Kodak Road house were fired out of the same unknown firearm, which had class characteristics of a Glock firearm. Although he was unable to determine whether the shell casings and the collected bullet came from the same firearm, he was able to state that the bullet was likely fired from a Glock. Sergeant Dalton also stated that the bullet's shape, class characteristics, and construction was likely manufactured by Hornady, which was consistent with the manufacturer of the two cartridge cases he examined.

On cross-examination, Sergeant Dalton acknowledged that he compared the two cartridge cases to one another because he did not have a gun with which to compare them. He agreed that although the markings on these cartridge cases were put into a ballistics database, there was no match, so he was unsure what gun fired these cartridge cases. Sergeant Dalton acknowledged that he had no way of knowing when the cartridges cases and bullet landed on the floor at the Kodak Road house.

Caleb Neely testified that in March 2021 he was a corrections officer for the Knox County Sheriff's Office. On March 5, 2021, he conducted a random cell search of the Defendant's cell and recovered several documents. He stated that the Defendant was the only individual housed in that cell. He noted that the documents he found contained Kendra Ivey's name and stated, "You're not just family, you're blood," which he stated could reference the Bloods street gang. One of the documents stated, "The more you help them, the more you help them convict you. Kendra Ivey, write this to her." Another document said, "Little Miss, Remember, we family first," and in parenthesis stated, "blood." Neely acknowledged that he did not know to whom "Little Miss" referred or whether this document was talking about the Bloods street gang or being related by blood. He said that as he was conducting his search, the Defendant yelled that the documents he was reviewing were legal documents because corrections officers typically skim legal documents to ensure they do not contain contraband. However, Neely stated that these documents did not look like legal documents because they were written with a pencil on notebook paper. He noted that a fourth document, consisting of three pages, was also photographed in the Defendant's cell.

On cross-examination, Neely confirmed that he was initially interested in these documents because they had the word "blood" written at the top of them. He acknowledged that the statement in the document, "Remember, we family first, blood" and "Yo cuz" could just mean that it was a letter to a family member; however, he noted that "Yo cuz" is a form of slang that gang members use when referring to one another.

Detective Steven Ballard with the major crimes unit of the Knox County Sheriff's Office testified that he first became involved in this case on February 12, 2021, when Officer Joshua Fischer contacted him. As a result of this conversation, Detective Ballard learned that the victim had been missing from Roane County since February 7, 2021, and he contacted Investigator Crothers and asked him to send over the victim's phone records. Detective Ballard also learned that the victim was supposed to be meeting Kendra Ivey when he disappeared, so he attempted to locate Ivey for the purpose of interviewing her. He found Ivey on February 17, 2021, when Officer Fischer pulled her over during a traffic stop. Shortly thereafter, Detective Ballard and Detective Shipley conducted a recorded interview with Ivey. He stated that Ivey's phone was later collected from her friend Elizabeth Terry's apartment. Detective Ballard noted that Ivey's phone was found inside a bag of rice.

Based on the information Ivey provided, Detective Ballard and other deputies went to the vacant home at 7048 Kodak Road the same day, where they found the deceased victim. Consequently, Ivey was charged with first degree murder. Detective Ballard said that although they had received tips about the victim's case, none of these tips identified the Defendant as a potential suspect. He agreed that the sheriff's department did not start looking for the Defendant until after they talked to Ivey.

After his interview with Ivey, Detective Ballard was able to obtain receipts from the Econo Lodge, showing that Ivey had rented a room there from February 6, 2021, to February 8, 2021. He also obtained still shots from the Econo Lodge showing the Defendant entering the door of Ivey's room. He additionally obtained a receipt from the Glade Springs Motel in Virginia showing that Ivey checked in on February 14, 2021, and checked out on February 16, 2021.

Detective Ballard stated that on February 16, 2021, the victim's 1989 Chevy Blazer, which had been painted black in areas to alter its appearance, was found at a Home Depot in Virginia. Another officer located Diana Jeanty, the Defendant's mother, at a gas station at 7401 Strawberry Plains Pike where Jayda Martinez, the Defendant's sister, worked. Following her recorded interview on February 18, 2021, Diane was charged with accessory after the fact and tampering with evidence. After Diane's interview, Detective Ballard executed a search warrant for the residence at 6944 Berry Lane. He also interviewed Jayda

Martinez and Jordan Franklin the same day, but neither of these individuals were charged with offenses related to this case.

Detective Ballard stated that during his investigation, he obtained Facebook records and cell phones for several individuals involved in this case. Ivey told him that the victim's cell phone and the Defendant's gun were thrown into a body of water near Diane Jeanty's home. He said that although deputies searched the ponds nearby, they were unable to locate the victim's cell phone and the murder weapon.

On February 26, 2021, Detective Ballard executed a search warrant for the trailer at 2804 Rifle Range Road because he learned the Defendant was at that residence. Deputies found the Defendant hiding in the closet at that residence. They also found the Defendant's possible girlfriend, Amanda Blanchard, and another male by the name of "Cordero" there. The Defendant and Blanchard were taken into custody, and Blanchard was charged with accessory after the fact in this case.

On cross-examination, Detective Ballard acknowledged that Kendall Dean, Ivey's sister, told law enforcement that she told "Douglas" that the victim was shot by "Jonathan." He stated that he was unsure who Douglas or Jonathan were, although he asserted that he followed up on the leads he had.

Detective Ballard said that he received a tip from Roane County, which asserted that Ivey was responsible for the victim's disappearance but did not mention that the Defendant was involved. He agreed that the Defendant was not present on the video from the Home Depot in Virginia where the victim's vehicle was found or the video from the gas station at 7401 Strawberry Plains Pike. Detective Ballard admitted that he did not receive the video surveillance from the Econo Lodge, and as a result, law enforcement was unable to see who returned to the Econo Lodge with the victim's cell phone.

Detective Ballard stated that he began looking for the Defendant after he talked to Ivey. He said that before they located and arrested the Defendant, there were news stories stating that law enforcement was looking for the Defendant because he was wanted for the victim's murder.

Detective Ballard stated that when he interviewed Ivey, she claimed that she and the victim were going to the vacant house on Kodak Road to purchase drugs. He acknowledged that the first time that Ivey was recorded as saying that she was at the vacant home and saw the victim's shooting was at this trial. He agreed that Ivey was the first person of interest in this case because she was the person who communicated with the victim and lured him to town. Detective Ballard acknowledged that Ivey provided many details during her testimony at trial, including that Jordan Franklin returned to the vacant house with her to

- 12 -

retrieve the victim's cell phone, that she had never shared during her interview. He agreed that Ivey had been charged with the victim's murder for two years and had hired an attorney, who presumably had received discovery about the details of this case.

Detective Ballard stated that although Ivey initially claimed during her interview that Diana Jeanty was at the vacant home on Kodak Road when the victim was shot, Ivey testified at the Defendant's trial that Diane Jeanty was not present at the vacant home during the shooting. He also acknowledged that the pants, with the Defendant's blood on them, that were found at the home on Berry Lane, had Diana Jeanty's driver's license and social security card inside them. He also admitted there was a backpack at the Rifle Range Road home, where two notebooks were found, that had a wallet containing Jeanty's credit cards.

Detective Ballard admitted that none of the Facebook messages he reviewed showed any communication between the Defendant and Ivey. He stated that although the motel in Virginia was rented by Ivey, there was no video footage recovered from that motel, which meant that he did not know who was at the motel with Ivey. He agreed that Diana Jeanty was in the video footage from Home Depot.

Dr. Max Rollins, an assistant medical examiner with the Knox County Regional Forensic Center, was accepted as an expert in the field of forensic pathology. Dr. Rollins stated that although one of his colleagues performed the victim's autopsy, he had reviewed the report in the medical examiner's file. He stated that the victim's manner of death was homicide and the victim's cause of death was a gunshot wound to the chest. He noted that this bullet entered the victim's left upper chest, hit the left lung and heart, and exited the body on the left part of the victim's mid-back. Dr. Rollins noted that stippling on the victim's hoodie indicated that a second gunshot was fired at the victim.

The Defendant chose not to testify on his own behalf.

At the conclusion of trial, the jury convicted the Defendant of the charged offenses of first degree felony murder, especially aggravated robbery, and unlawful possession of a firearm by a convicted felon. At the Defendant's sentencing hearing on the especially aggravated robbery and firearm convictions, the trial court imposed an effective sentence of life imprisonment plus four years.

**Post-Trial Proceedings.** On August 8, 2023, the Defendant filed an ex parte motion authorizing the hiring of a forensic biology consultant to assist defense counsel in reviewing police and crime scene documentation; in reviewing crime laboratory, forensic serology, and DNA reports; in interpreting the results of such reports; and in reviewing transcripts. The same day, the trial court entered a written order granting this request.

On August 21, 2023, the Defendant filed the Defendant Specific Discovery Request No. 1, seeking a large number of forensic and scientific materials; crime scene documents; laboratory policies, procedures, and protocols; competency documents for all forensic personnel; and quality assurance and control documents. The State opposed this discovery request on the basis that the Defendant had not shown how the discoverable items were material to the preparation of his defense, as required by Tennessee Rule of Criminal Procedure 16.

On October 2, 2023, the Defendant timely filed his motion for new trial.

On May 10, 2024, the trial court entered a written order denying the Defendant's Specific Discovery Request No. 1, finding that there had been no showing of materiality but indicating that the Defendant could "re-raise this issue in a petition for post-conviction relief, or, if he so chooses, in an amended motion for new trial alleging ineffective assistance of counsel in relation to the DNA evidence along with supporting evidence of materiality."

On June 21, 2024, the Defendant filed a Motion to Reconsider Specific Discovery Request No. 1, which was accompanied by an affidavit from his expert explaining the materiality of the requested documents in the Defendant's the motion for new trial, which would include a claim for ineffective assistance of trial counsel.

On June 21, 2024, the Defendant filed an amended motion for new trial, and on June 24, 2024, the Defendant filed a second amended motion for new trial, collectively arguing that the evidence was insufficient to sustain his convictions; that the State failed to independently corroborate the testimony of codefendant Kendra Ivey; that the trial court erred in admitting writings posited as rap lyrics authored by the Defendant; that the trial court erred in allowing the State to amend the presentment the morning of trial; that the trial court erred in allowing Kendra Ivey to testify to double hearsay; that the Defendant received ineffective assistance from trial counsel; that the trial court erred in denying the Defendant's Specific Discovery Request No. 1, which requested materials necessary for his state-funded expert to complete her work; and that the cumulative effect of these errors denied the Defendant of a fair trial.

On June 24, 2024, the date of the motion for new trial hearing, the Defendant filed a motion to continue the motion for new trial hearing for the purpose of preserving the Defendant's right "to effective assistance of counsel, to call witnesses on his behalf, to due process, and to a fair trial." At the hearing, after hearing proof and argument from counsel, the trial court denied both the motion to continue and the motion to reconsider the Defendant's Specific Discovery Request No. 1. As a result, the Defendant withdrew his ineffectiveness claim but proceeded on the remaining claims in his motion for new trial. At

the conclusion of the hearing, the trial court denied the motion for new trial and entered a written order to the same effect. The Defendant then timely filed his notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends that the evidence is insufficient to sustain his convictions. He argues that the State failed to present evidence independently corroborating codefendant Kendra Ivey's testimony and that the evidence is generally insufficient to sustain his convictions. The State counters that the Ivey's testimony was "readily corroborated" by physical evidence, DNA evidence, and the Defendant's own writings. It also contends that a rational jury could find all the elements of the conviction offenses beyond a reasonable doubt. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at

379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

A. **Corroboration of Accomplice Testimony**. The Defendant insists that Ivey's testimony was the only proof connecting him to the victim's murder and that because Ivey's testimony was insufficiently corroborated, it cannot support his convictions in this case. Although the Defendant acknowledges that there was independent proof that a crime had been committed because Ivey led the police to the victim's body, he claims there was no independent evidence connecting him to the victim's murder, to the especially aggravated robbery offense, or to the unlawful possession of a firearm by a felon offense. The Defendant maintains that Ivey was responsible for the victim's murder and that there was no evidence presented at trial connecting him to the crimes.

In State v. Thomas, 687 S.W.3d 223, 242-43 (Tenn. 2024), the Tennessee Supreme Court abrogated the common-law rule requiring accomplice testimony to be corroborated by proof connecting the defendant with the commission of the crime charged. In abolishing this old common-law rule, the Thomas court held:

Until such time as the Committee on Pattern Jury Instructions (criminal) of the Tennessee Judicial Conference adopts a permanent instruction on this issue, the trial courts of our state should utilize the following temporary jury instruction in cases involving accomplice testimony:

The prosecution has presented a witness who claims to have been a participant with the defendant in the crime charged. While you may convict upon this testimony alone, you should act upon it with great caution. Give it careful examination in the light of other evidence in this case. You are not to convict

- 16 -

upon this testimony alone unless you are convinced beyond a reasonable doubt that it is true.

Id. at 248. The Thomas court also held that this new rule of law should be applied prospectively, not retroactively, to avoid violating due process protections, stating: "[I]n the interest of fairness, we will apply the common law accomplice-corroboration rule to [the defendant in the Thomas] case, but the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after the date of the mandate." Id. at 245 (emphasis added); see State v. Slater, No. M2024-01280-CCA-R9-CO, 2025 WL 688920, at *1, *5-6 (Tenn. Crim. App. Mar. 3, 2025) (reiterating that the Thomas court intended the new law to apply to trials commencing after March 7, 2024, the date the Thomas mandate issued).

Prior to Thomas, Tennessee law provided that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is a person who "knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); Clapp v. State, 30 S.W. 214, 216 (Tenn. 1895)). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. Collier, 411 S.W.3d at 894. The Tennessee Supreme Court provided the following requirements for corroboration of accomplice testimony:

"[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The jury must determine whether sufficient corroboration of accomplice testimony exists. Id.

In this case, the Defendant's trial commenced on February 21, 2023, which is prior to March 7, 2024, the date the mandate was issued in the Thomas case. Accordingly, it is appropriate to apply the common-law rule requiring accomplice testimony to be corroborated.

Here, the trial court properly instructed the jury that it had to determine whether Ivey was an accomplice and, if the jury found that she was an accomplice, then it had to determine whether Ivey's testimony was sufficiently corroborated. The court provided the jury with the following instruction in this case, which follows the pre-Thomas pattern jury instruction for accomplices:

> An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender unites with him or her in the commission of the crime.
>
> If a witness was an accomplice in the crime, then his or her testimony must be corroborated. Corroborating evidence is that evidence, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. This independent corroborative testimony must include some fact or circumstance that affects the defendant's identity. Corroborative evidence may be direct or entirely circumstantial and it need not be adequate, in and of itself, to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the defendant with the crime charged. It is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated.
>
> In this case, the Court charged you that the witness, Kendra Ivey, was an accomplice in this alleged crime and before the defendant can be convicted, you must find that this accomplice testimony has been sufficiently corroborated.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.09 (2021 ed.) (amended following the holding in Thomas).

At the motion for new trial hearing, the trial court determined that Ivey's testimony that the Defendant was involved in the charged crimes was primarily corroborated by the "journal entries" and the Defendant's "being shot in the leg without medical treatment." The court noted, "[T]he corroboration doesn't have to be proof in and of itself to support a conviction, just to corroborate Ms. Ivey's testimony about [the Defendant's] role in the crimes. And I think it does."

We conclude that Ivey's testimony identifying the Defendant as a perpetrator was sufficiently corroborated by the evidence establishing Defendant's untreated gunshot wound to his leg, the DNA proof connecting the Defendant to the victim's red SUV, and Bruce Wiggleston's testimony and the accompanying surveillance footage showing a red truck and excessive smoke coming from the Defendant's mother's backyard. Ivey's description of the incident included the victim's attacker being shot in the leg. Significantly, the Defendant, at the time of his arrest, had a gunshot wound to his right leg, for which he never received treatment at a hospital. In addition, the Defendant's DNA was a match to the cigarette found in the backseat of the victim's stolen vehicle and was consistent with DNA recovered from the gear shifter of the victim's stolen SUV, and this evidence firmly places the Defendant in the victim's SUV. Moreover, Wiggleston's testimony and the related security video footage showed that on the morning after these crimes, a red "truck," like the one stolen from the victim, was taken to the Defendant's mother's home, and excessive smoke emanated from the firepit in her backyard, which was consistent with the destruction of evidence related to the crimes. This evidence certainly "tends to connect the Defendant to the charged offenses," even without the proof of the Defendant's rap lyrics, which we believe were properly admitted, as explained in the section below.

As support for his claim that there was insufficient corroboration, the Defendant highlights the portions of Ivey's testimony that he feels were not credible or were not corroborated by other proof. Specifically, the Defendant asserts: (1) his blood and DNA were not found inside the Kodak Road home; (2) his blood was never found in the backseat of the victim's Blazer (3) his blood was never found on the floor of his mother's home; (4) there were no Facebook messages confirming that Ivey and the Defendant communicated around the time of the crimes; (6) there was no evidence showing that Ivey returned to her room at the Econo Lodge to retrieve her belongings before taking an Uber back to the Defendant's mother's home; (7) there was no evidence that Ivey actually rented a hotel room in her name in the Virginia and West Virginia area; (8) there was no proof that the Defendant submerged Ivey's cell phone in water; (9) the Ring camera evidence showing a red "truck" and smoke from a firepit in the backyard was meaningless without proof corroborating that the victim died before 9:36 a.m. on February 8, 2021; (10) the location data from the victim's cell phone, which showed that it was last placed at Ivey's room at the Econo Lodge on February 8, 2021, contradicted Ivey's testimony that she returned to the Kodak Road home to retrieve the victim's phone and that this phone was ultimately disposed of in a pond near Diane Jeanty's home by Jayda Martinez and Jordan Franklin.

We agree that the State had no obligation to corroborate or prove the veracity of each detail of Ivey's testimony. See State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997) ("The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the

accomplice's testimony <u>nor is it required to extend to every portion of the accomplice's testimony</u>. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony.") (footnotes omitted) (emphasis added). Consequently, the State was only required to provide "slight circumstances" that tended to connect the defendant to the crimes at issue. <u>Id.</u> Moreover, it was the jury's responsibility to determine whether the State provided these "slight circumstances" by weighing the different pieces of corroborative evidence. <u>See</u> <u>Shaw</u>, 37 S.W.3d at 903. In the Defendant's case, the jury, by its verdict, determined the State had presented evidence that "fairly and legitimately tende[d] to connect the Defendant with the commission of the crime charged." <u>Id.</u> Accordingly, we firmly reject the Defendant's request to substitute the jury's weighing of this corroborative evidence with our own.

While acknowledging that his DNA on a cigarette butt in the floorboard of the victim's vehicle and his DNA on the driver's seat adjustment level connected him to Ivey and to the victim's vehicle, the Defendant argues this DNA evidence fails to show that he knew this vehicle belonged to the victim, rather than Ivey, and fails to show that he was engaged in the theft of this vehicle. <u>See</u> <u>Thomas</u>, 687 S.W.3d at 250 (reiterating that evidence that the defendant was present at the situs of the crime and had the opportunity to commit the crime is not sufficient to corroborate accomplice testimony). The Defendant claims his DNA merely cast suspicion on him by placing him in the victim's vehicle. We disagree. The Defendant's untreated gunshot wound to his leg, the presence of the Defendant's DNA on and in the victim's red Blazer, and Wiggleston's testimony and his accompanying surveillance footage provided abundant evidence tending to connect the Defendant with the commission of these offenses, even without considering the particularly inculpatory evidence regarding the Defendant's rap lyrics.

**B. <u>Sufficiency of the Evidence.</u>** The Defendant also argues that the evidence is generally insufficient to establish the elements of each of the charged offenses. He claims that portions of Ivey's story were directly refuted by proof and that "investigators and prosecutors chose to ignore these problems" and proceed with his prosecution."

As charged in this case, first-degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2021). In order words, to sustain the conviction for felony murder in this case, the State was required to prove that the Defendant killed the victim in the perpetration of a theft. <u>See id.</u> "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." <u>Id.</u> § 39-14-103(a).

Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." <u>Id.</u> § 39-13-403(a). Robbery is

defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Lastly, it is an offense for a person who has been convicted of a felony to possess a handgun. Id. § 39-17-1307(c)(1).

At the motion for new trial hearing, the trial court first determined that Ivey's testimony identifying the Defendant as a perpetrator was sufficiently corroborated by the journal entries and the Defendant being shot in the leg without medical treatment. The court found that once you "get past" the corroboration of Ivey's testimony, then the proof is sufficient to sustain the convictions because you have testimony from Ivey, an eyewitness to the offenses, who stated exactly what happened. Accordingly, the trial court determined that there was "sufficient evidence to support the convictions in the case."

First, the Defendant asserts that although Ivey testified that the victim died on February 7, 2021, the victim's body, which was discovered on February 17, 2021, showed minimal signs of decomposition. He claims that although the State suggested in its opening statement that the victim's body was preserved because it was forty-six degrees inside the home when the victim's body was found, there was no proof presented regarding the outside temperature on February 17, 2021, or in the ten days prior to the discovery of the body. He also asserts that neither the prosecutor nor defense counsel asked the medical examiner about the lack of decomposition of the victim's body. The Defendant insists that the victim's "time of death mattered because, according to the State, [the Defendant] left Tennessee on February 8 or 9, 2021, and did not return until [the victim's] body was discovered." The Defendant argues that the victim's later time of death meant that he was not present at the time when the victim was murdered. We believe that based on the evidence presented at trial, a rational jury could have found that, to the extent this issue was raised, the cold temperatures inside the vacant house preserved the victim's body. Moreover, by its verdict, the jury clearly and reasonably accredited Ivey's testimony regarding the date of the victim's death.

Second, the Defendant claims the State failed to present any proof that the Defendant possessed a firearm or committed a theft by force using a deadly weapon that resulted in serious bodily injury to the victim. He claims there was no proof that he possessed the gun that fired the bullet into his leg or that he possessed the gun that fatally shot the victim. He notes that although Ivey testified that the murder weapon was a .45 caliber Hornady handgun and that this gun and the victim's cell phone were thrown into a body of water near the Defendant's mother's home after the shooting, the police never recovered the cell phone or the gun. He also claims that although the shell casings from a .45 caliber handgun collected at the Kodak Road home and swabs from those casings were sent to the TBI to be forensically tested, none of these items contained the Defendant's DNA or fingerprints. The Defendant also asserts that although Ivey testified that the victim was shot in a room adjacent to the kitchen and that the Defendant shot himself in the leg in the same room, the

- 21 -

swabs from the reddish brown stains were not consistent with the Defendant's blood. We conclude that given Ivey's testimony regarding the Defendant's gun and the proof regarding the Defendant's gunshot wound, the jury could have easily determined that the Defendant committed the offenses of especially aggravated robbery and unlawful possession of a firearm by a convicted felon.

Third, the Defendant asserts that location data shows that the victim's cell phone traveled from Ivey's hotel room to a rural area of Strawberry Plains and then returned to Ivey's hotel room. Because the cell phone location data contradicts Ivey's testimony that the victim's cell phone went from the vacant Kodak Road home to the body of water near the Defendant's mother's home, the Defendant contends that there is insufficient evidence to sustain his convictions. We reiterate that the jury must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. See Campbell, 245 S.W.3d at 335 (citing Byrge, 575 S.W.2d at 295). We will not re-weigh the evidence or substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659).

Fourth, the Defendant contends that, aside from Ivey's testimony, there was no proof that the Defendant took the victim's property by violence or by putting the victim in fear. He notes that although Ivey testified that she believed the Defendant intended to take money from the victim, she also said she thought the victim gave her all his money. Ivey did not provide any specific testimony about what the Defendant demanded before firing a shot near the victim's head. In addition, he claims that although Ivey stated that the Defendant told her to get the victim's car keys after the victim was fatally shot, Ivey admitted that she drove the victim's car, thereby exercising control of it, while the Defendant rode in the backseat. Moreover, the Defendant acknowledges that his DNA was found on a seat adjustment lever and a cigarette butt inside the victim's car but claims this evidence merely placed him in the victim's car at some point and failed to show he exercised control over the victim's vehicle after the shooting. Furthermore, the Defendant contends that the State presented no proof that the victim's car was taken prior to the victim's death. He claims the State's theory was that the victim was killed before Ivey or Jordan Franklin took the victim's car keys, which meant that the victim was not put in fear before his car keys were taken. Lastly, regarding the victim's cell phone, the Defendant notes Ivey's testimony that she and Franklin returned to the Kodak Road home later to retrieve the victim's cell phone because the Defendant wanted the victim's phone to delete evidence. Consequently, the Defendant argues that the victim's cell phone was not the subject of a theft because it was not taken until after the victim died and because there was no proof showing that the phone was taken with the intent to deprive the victim of it. Initially, we note that the theft of the victim's cell phone and Chevy Blazer were the specified targets of the robbery in Count 5, not the victim's wallet or any cash therein. The State's theory in Count 5 was that Defendant knowingly obtained or exercised control of the victim's cell phone and Blazer by shooting

- 22 -

the victim in order to take this property by violence of by putting the victim in fear, which resulted in the victim suffering serious bodily injury. See Tenn. Code Ann. § 39-13-403(a). Because there was sufficient evidence to support the State's theory in this count, the Defendant is not entitled to relief.

We conclude that the evidence was sufficient to sustain all three of the Defendant's convictions. Ivey testified that she and the Defendant planned to rob the victim after the Defendant mentioned he wanted to rob someone. Ivey contacted the victim and convinced him to meet her by promising him sexual intercourse. Ivey then persuaded the victim to take her to the vacant house suggested by the Defendant. Once inside, the Defendant pulled out a gun and fired a warning shot near the victim's head, which resulted in the victim grabbing for the gun. Ivey testified that the Defendant fired two shots during the struggle. The Defendant hit himself in the leg with one shot, and the other shot hit the victim in the chest, ultimately killing him.

After firing these shots, the Defendant instructed Ivey to take the victim's keys. When Ivey went inside the house to get the keys, she said the victim was still alive and was lying on the floor "gurgling." Ivey grabbed the victim's keys, and she and the Defendant drove the victim's car away from the scene. A short time later, the Defendant demanded that Ivey return to the scene to get the victim's phone, which she did.

When the evidence is viewed in the light most favorable to the State, it is sufficient to support all three of the Defendant's convictions. Regarding the first degree felony murder conviction, Ivey's testimony established a plan to take property from the victim, detailed how the Defendant brandished a gun to accomplish this theft, and explained how the Defendant shot the victim as they were struggling over the gun before the Defendant and Ivey left the victim to die. Given this evidence, a rational jury could have found that the Defendant intended to perpetuate a theft of the victim's property by the use of a deadly weapon and that the Defendant fatally shot the victim during the perpetration or attempt to perpetrate this theft, thereby establishing the elements of the felony murder offense. See id. § 39-13-202(a)(2).

As for the especially aggravated robbery conviction, Ivey's testimony established that the Defendant shot the victim, that the Defendant instructed Ivey to take the victim's keys while the victim was still alive, and then the Defendant and Ivey left the scene in the victim's car. The jury could have determined that the Defendant and Ivey used a handgun to inflict violence and serious bodily on the victim so they could collect the victim's keys and leave with the victim's car, with the intent to deprive the victim of his property. This proof clearly establishes the elements of especially aggravated robbery. See id. § 39-13-403(a).

Regarding the unlawful possession of a firearm by a convicted felon conviction, Ivey testified that the Defendant possessed a handgun during the planning stages of the robbery and during the robbery itself. At trial, the State introduced, without objection, a judgment showing the Defendant's prior felony conviction. By its verdict, the jury accredited Ivey's testimony about the Defendant's possession of a gun. Accordingly, the proof establishes all the elements of the felon in possession offense. Id. § 39-17-1307(c)(1).

**II. Introduction of Writings as Rap Lyrics.** The Defendant contends that the trial court abused its discretion in admitting three different writings, which were attributed to the Defendant as autobiographical rap lyrics, because they were "significantly more prejudicial than probative." He claims these writings, which were inflammatory and irrelevant, were used by the State to attack his character, rather than used as proof to corroborate Ivey's testimony that the Defendant was involved in the charged offenses.

The State counters that the trial court acted within its discretion in admitting these writings because the lyrics had a high probative value that was not significantly outweighed by any danger of unfair prejudice. It asserts these lyrics "repeatedly referred to specific facts and details of the robbery and murder of [the victim], the subsequent flight to New Jersey, and the media coverage of the murder." It also asserts that all three writings, which were written in first person, describe: his shooting a man in the "torso" after that man shot him in the leg; a plan to get rid of evidence, namely a phone, a gun, and a car; the author's face on the news because he was wanted "for a body"; and the discovery of the crime by law enforcement after an unidentified female "opened her mouth." The State notes that the writings collected from the Defendant's cell also make reference to the Defendant's flight from Tennessee to New Jersey after the shooting. The State insists that all three writings "have a high probative value because they mirrored the crime and were authored close in time to the offense." Although the State acknowledges that these writings had a "potential danger for unfair prejudice due to the inflammatory language otherwise used in the lyrics," it contends that the prejudicial nature "was not so high as to substantially outweigh the probative value of lyrics that repeatedly referenced the crime such that exclusion under Rule 403 was warranted." At a minimum, the State contends that reasonable minds could differ regarding the writings exclusion, which necessitates a conclusion that the trial court did not abuse its discretion in admitting these writings. We conclude that the trial court did not abuse its discretion in admitting these rap lyrics.

Some of these writings, identified as a Composition Notebook and a smaller Reporter's Notebook, were discovered in the residence on Rifle Range Road where the Defendant was arrested. Later, similar writings were found in the Defendant's cell. All three writings were attributed to the Defendant as autobiographical rap lyrics. Defense counsel filed a motion to exclude these writings prior to trial.

At the motion hearing, Investigator Stephen Ballard with the Knox County Sheriff's Office testified that the notebooks found at the Rifle Range Road house contained references to the writer being shot in the leg, which coincided with the Defendant's recent gunshot injury to his leg. He also stated that these notebooks referenced the writer's face being on the news and noted that the Defendant's photo was placed on the news as a part of the investigation. In addition, he stated that the notebooks also mentioned "Dump the gun. Dump the phone. Dump the car. I keep it solid." He stated that although the victim was fatally shot, the gun was never recovered. In addition, he stated that the victim's vehicle was at the center of this case, and it was recovered in Virginia, a couple of hundred miles away from the crime scene in this case. Investigator Ballard also noted that some of the lyrics in the notebook also stated, "If she never opened up her mouth, they still wouldn't know about it." He confirmed that the co-defendant in this case was Kendra Ivey, who cooperated with law enforcement in this case. He acknowledged that neither of these notebooks had the Defendant's name on them.

Caleb Neely, a former correctional officer with the Knox County Sheriff's Office, also testified at the motion hearing. Neely stated that he randomly searched the cell that only housed the Defendant in March of 2021 and found a stack of notebook paper that had Kendra Ivey's name and IDN number on it. He stated that these papers contained the following lyrics: "We ain't family, but we're blood," "That N[---]a shot me in the leg. I shot that p[---]y in his gut," "Dump the phone. Dump the car. Dump the gun. Keep it solid," and "They got me on the news. They talking about a body."

At this hearing, defense counsel argued that because these writings had not been directly connected to the Defendant, "the prejudicial value's just way greater than the probative value and they cannot be authenticated." The State countered that these lyrics were "highly probative" because they go "directly to the identification of the individual who shot and killed [the victim]." At the conclusion of the hearing, the trial court noted that the lyrics were "so highly probative, that it'd be . . . hard to find a level of unfair prejudice that would outweigh it." Shortly thereafter, the trial court entered an order holding that the writings at issue were sufficiently authenticated as having been written by the Defendant pursuant to Tennessee Rule of Evidence 901(3) and (4), that the writings were "highly probative of the defendant's involvement in the alleged crimes for which he [wa]s on trial" while the "danger of unfair prejudice [wa]s minimal," and that "the probative value [wa]s not substantially outweighed by the danger of unfair prejudice[.]"

At trial, portions of the writings from the Composition Notebook and the Reporter's Notebook from the Rifle Range Road residence and portions of the writings from the Defendant's jail cell were admitted as exhibits without specific reference to the specific lyrics contained therein.

During the State's first closing argument, the prosecutor recited the following lyrics from the Reporter's Notebook found at the Rifle Range Road residence:

I just got some top from this
lil b[---]h named Megan.

She trying to be my lil b[---]h,
I'll just call you when I'm ready.

I just stuff that b[----]h with pill
and go straight to Kentucky.

You aint never seen no lil
n[---]a bluffing.

Ever time any see me then n[---]a
got to duck in.

That n[----]a shot me in the leg
I hit 'em in his stomach.

I take n[---]as for a joke
cause these n[---]as be funny.

I just want the top, lil b[----]h,
I aint came to do no.

I still had all the h[-]es
even when I was bummy

My whole face is on the news
they want me for a body.

Dump the gun.  Dump the phone.
Dump the car; Keep it solid.

If she never opened up her mouth
they still won't know about it.

F[--]k all that.  Big Nooch, just
called me[,] we back on the move

If police ever question me
I start actin confused.

During the first closing argument, the prosecutor then recited the following lyrics from the Composition Notebook found at the residence of the Rifle Range Road residence:

I just got some top, from this lil b[---]h
Her name was Megan

She wanna be my lil b[----]h.  I'll call you when
I'm ready

I just stuff that b[---]h with pills and go straight
to Kentucky

You aint never seen no money lil n[---]a
you bluffin

See me them n[---]as get to
runnin

Buss it.  I'm a shoot this b[---]h and I got something that
told a hunnit

That n[---]a shot me in the leg.  And I hit that n[---]a
in his stomach

For a joke as these n[----]as
be funny

My whole face is on the news.  They want me
for a body

Dump the gun,  Dump the phone,  Dump the
car; Keep it solid

If she never opened up her mouth, they still

won't know about it

Quit wit all the [] we know that you
aint about it

F[--]k all dat. Big Nooch just called. Now
we back on da move

If police ever question me, I start actin
confused

Momma told me, make 'em work. S[--]t what you got to lose

Do it, I'm a real gangsta, I aint got
nothing to prove

I'm just riding through the city, b[---]h
I keep that Glock wit me

Catch an opp and watch me score, hell
nah, it aint no blockin me

Don't fuck wit social media cuz I know
that they watchin me

That n[---]a told me pulled up, so I pulled
now he coppin pleas

If you aint getting to no real money you just wasting
time

Watch what you be doin in front of b[---]hes
cuz they be droppin dimes

I goin through this sh[-]t right now
swear dat I aint l[ying].

I can't never go out like no h[-]
me a f[--]kin lion

N[---]a say he want the smoke b[---]h puff

it up

B[---]h you know what I stay with a
pole, wont go for nun

Catch a body, then I hit the road.  I'm
on the run.


At the conclusion of the State's initial closing, the prosecutor recited the following lyrics from the writings found in the Defendant's jail cell:

I'm not the police, baby.  I cannot be.  Be tough.
I got 1 b[---]h that I'm f[--]kin wit right now, that enough.
If you think that I wont blow this b[---]h, don't come here test my bluff

That n[---]a shot me in my leg, I shot that p[---]y in his
gut

They got me all on the news, they talking bout a body
Wen the police locked me up, I told them I D[on't] K[now] about it

Dump the phone.  Dump the car.  Dump the gun;  Keep it solid
First-degree felony murder, damn lil murky out here wildin

Shout out to my Momma Dukes cuz she done raised a beast
Now I got a lil boy, he lookin up to me
She know when I leave the house that I'm safe cuz I got the heat
He be screaming out gang and that n[---]a only 3

Baby I'm a menace.  How the f[--]k dat you aint know
He aint wanna stop the car, I shot that n[---]a in his toe
Now, I think about it, I shoulda hit them in his fro
Happened in front of a church, Guess, It wasnt his time to go

Jayda that's my rock.  She knew her brother out here thuggin
Every time Im on the run, I hit the road; call my cousin
When they get my call they like, I know you up to something
I go to a whole 'nother state if it aint jumpin
You should have seen when I shot him, I thought he was []

Now, let's talk about some money street s[--]t got one board
You aint callin about no hunnits[,] Ima going to press ignore
I heard these n[---]as be sleepin on me I just let em []
If I got yo b[---]h with me right now she doin a chore

He wanted some perk I sold his a[--] some ibuprofen.
He said he from outta town well, f[--]k it then cuz I don't know him
If he come in shop wit with me again then I know he a duck
Quack like a duck, you betta duck, you get yo feathers plucked

I'm a rock star, baby[,] I keep it heavy metal tuck[]ed
F[--]k a cop car cant pull me over[,] I aint lettin em

Don like n[---]as  I'd rather just get em out the way
I just touched down in NJ.  Sh[-]t who got the []
They callin' me stating [] cuz I like to
Crank/ I hadda bullet stuck in my leg like Doctor Frank

I can sell sand to a beach if it got plenty []
Rob the plug soon as we meet[,] [] who he was
[] I'm clutching on heat[,] Ion know who to treat
They say money grown on trees, dat mean I'm rooted up
murky.

Why you lookin like that cuz bitch Im booked up
You bitch talkin real crazy to you[,] she aint been through enough

I just gave my fein a lil tester []
shoot it up
He like this the best in the city
I told em true enough.

I just bought some green s[--]t/ I feel like pop off
New ghoul name is Debo[,] it leave you cock eyed
You can try to do all that blockin[,] you aint gon block
I be posted up in the hood[,] just a stop sign
Catch a body[,] Go sell the Glock that's a hot nine
My phone been boomin all day[,] this the hot line

You can ask my family bout me b[---]h  I am not lyin
I might be locked up but I aint dead you can stop cryin

During his closing, defense counsel addressed the State's reference to these lyrics, arguing that there was no testimony proving that the Defendant wrote them and that the jury should not use lyrics as "admissions and confessions" because its "art" and "[i]t's not all true."

At the State's rebuttal closing argument, the prosecutor stated, "[The Defendant] had to brag about it. He had to talk about it. He was happy. He was pleased with what he had done. And that's what those jail lyrics are." The prosecutor then stated:

> You don't have to know anything about Johnny Cash or Eddie Money or any of those individuals to know that the [D]efendant is describing the murder of Danny Letner, why he did it, what he did with the evidence afterwards, who he did it with, that's what those lyrics are about, that's what those statements are about. It's not art. It's admissions.

Thereafter, the prosecutor connected the lyrics above to the following facts: the Defendant was shot "in the leg;" Detective Ballard testified that the Defendant's name and photograph were "on the news" during the investigation because they wanted him "for a body;" Ivey "opened up her mouth" to disclose the crimes to law enforcement; the murder weapon was determined to be "Glock"; the murder weapon was "dump[ed]" and never recovered; the victim's Chevy Blazer was "dump[ed]" when it was abandoned in Viriginia; Jayda and Jordan failed to "keep it solid" because they talked about the crimes; there were no "social media" Facebook messages by the Defendant, Ivey, Jeanty, Jayda, or Jordan; and the Defendant "hit the road" and stayed with his "cousin" in "New Jersey" after the victim was shot. The prosecutor also made the following argument during his final closing:

> [These lyrics and notes] are admissions, ladies and gentlemen of the jury. These are pieces of evidence, little confessions, if you will, detailing what he did and what he was doing. He killed somebody for . . . what? For— what change did [the victim] have? I mean, what was it? Ten, $15 in change? . . . And [the Defendant's] bragging about it.

At the motion for new trial hearing, the trial court found that the journal entries, which were introduced as rap lyrics written by the Defendant, "were specific enough that . . . they . . . were a factual historical retelling of what had occurred." While the court recognized that all the facts in the journal entries did not "completely line up" with the facts in this case, it felt there were "sufficient facts" for "a reasonable juror" to look at these writings and say that the Defendant was "recounting a historical event that he was involved in." As a result, the court determined that the writings were "highly probative"

- 31 -

because they were "tantamount to a confession" by the Defendant and "any danger of unfair prejudice" was "outweighed by that probative value." The trial court also noted that it "instructed the jury . . . if there's a writing or a statement of the defendant, you can believe all of it or none of it, it's up to you." It stated that it believed "the jury probably put the same weight [on these journal entries]" that it did, believing that the Defendant "really was recounting a historical event" of his commission of the crimes in this case. Ultimately, the trial court held that it was not error to admit these journal entries.

The Defendant argues that these three writings were irrelevant and that their probative value was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 401, 402, 403. He asserts that "we don't convict people for murder simply because they have written lyrics about murder." State v. Britton, 710 S.W.3d 177, 208 (Tenn. Crim. App. 2025) (citing Hart v. State, 688 S.W.3d 883, 896 (Tex. Crim. App. 2024)). The Defendant argues that much like the lyrics in Britton, the writings admitted in his case contain "general or vague references to violence," which are significantly more prejudicial than probative.

The Defendant also claims these writings are not probative because they do not match the facts in this case. The Defendant claims that at the time of his arrest, there was no evidence that he knew that Ivey had talked to the police, no proof that related to someone named Megan who was drugged before the Defendant went to Kentucky, and no evidence that the Defendant shot someone in front of a church. Although the State argues that these writings described the victim's shooting, the Defendant claims that the writings do not match the known facts concerning the victim's death. Specifically, he asserts the writings describe a man being shot in the stomach, while the victim was shot in his upper chest. In addition, although the State claimed that robbing a "plug" referred to the victim, Ivey testified that a "plug" meant a "drug dealer." In addition, while the State argued that the mentions of "Glock" and "hot nine" referenced the victim's death because the victim was killed with a .45 caliber gun, the Defendant asserts that the term "Glock" is used synonymously with "gun" and "hot nine" more likely refers to a 9mm pistol rather than a Glock .45.

In addition, the Defendant alleges that the trial court erred in admitting these writings with no proof regarding when they were written. While he acknowledges that he authored the writings found in his jail cell after his arrest, the Defendant claims the same cannot be said about the writings found in notebooks collected at the time of his arrest, which were undated and had no proof indicating that there were written after the victim's death. The Defendant also asserts that the "various drafts and changes between writings suggest[] that these were dramatic stories rather than auto-biographical accounts."

- 32 -

Finally, the Defendant argues that these writings, which were inflammatory and irrelevant, were used by the State to attack his character, rather than used as proof to corroborate Ivey's testimony that the Defendant was involved in the charged offenses. In particular, the Defendant asserts that the prosecutor recited these lyrics during his initial closing argument as the "most damning evidence" against him and then "repeated portions of the writings to explicitly attack [the Defendant's] character in rebuttal closing argument."

When a trial court makes an evidentiary ruling, "the appropriate standard of review on direct appeal is whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." State v. McCaleb, 582 S.W.3d 179,185-86 (Tenn. 2019) (citing Regions Bank v. Thomas, 532 S.W.3d 330, 336 (Tenn. 2017); State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015)); see State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010). As the Tennessee Supreme Court explained:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the [trial court] . . . or to substitute their discretion for the [trial] court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.
>
> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.
>
> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "'Excluding relevant evidence under [Tennessee Rule of Evidence 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" State v. James, 81 S.W.3d 751, 757-58 (Tenn. 2002) (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

The First Amendment to the United States Constitution protects music "as a form of expression and communication." Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989). However, the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); see State v. Williams, No. E2019-02236-CCA-R3-CD, 2022 WL 152516, at *20 (Tenn. Crim. App. Jan. 18, 2022). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." Mitchell, 508 U.S. at 489; see Williams, 2022 WL 152516, at *20.

It is well established that the admission of rap lyrics presents "'a serious risk of inflaming the jurors and influencing them to convict a defendant on impermissible grounds.'" Britton, 710 S.W.3d at 206 (quoting United States v. Williams, 663 F. Supp. 3d 1085, 1133 (D. Ariz. 2023). "[R]ap music containing offensive and inflammatory language may prejudice a jury." Id. (citing Montague v. State, 243 A.3d 546, 587 (Md. Ct. App. 2020) ("No matter how easily the State may meet the low relevance threshold when offering a defendant's rap lyrics as evidence, '[t]he admission of [a] defendant's inflammatory rap verses . . . risk[s] poisoning the jury against [the] defendant.'" (quoting State v. Skinner, 95 A.3d 236, 238 (N.J. 2014)). Frequently, "'rap music features fictional imagery, metaphors, and exaggerated storylines.'" Id. at 206-07 (quoting Williams, 663 F. Supp. 3d at 1133); see Hart, 688 S.W.3d at 895 ("The danger associated with playing these videos to the jury is that the jury might regard creative expression as proof that Appellant engaged in criminal behavior based upon his rap videos instead of regarding them as nothing more than creative

expression."); United States v. Bey, No. 16-290, 2017 WL 1547006, at *6 (E.D. Penn. Apr. 28, 2017) (noting that "rap music is a well-recognized musical genre that often utilizes exaggeration, metaphor, and braggadocio for the purpose of artistic expression" and asserting that "[b]ecause rap lyrics may falsely or inaccurately depict real-life events, they should not necessarily be understood as autobiographical statements" (footnote omitted)). This court has recognized the difficulty in identifying "'the probative value in fictional or other forms of self-expressive endeavors because it cannot be presumed that the author has acted in accordance with the views that he wrote about.'" Britton, 710 S.W.3d at 207 (quoting Williams, 663 F. Supp. 3d at 1133).

"[T]he probative value of rap lyrics is greatly diminished 'when it is unknown who wrote the lyrics, when the lyrics were written, when the songs were recorded and perhaps edited, and/or when they were uploaded to YouTube or similar social media.'" Id. (quoting Williams, 663 F. Supp. 3d at 1133). As the New Jersey Supreme Court in Skinner recognized:

> The difficulty in identifying probative value in fictional or other forms of artistic self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views. One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell-Tale Heart," simply because of their respective artistic endeavors on those subjects.

Skinner, 95 A.3d at 251-52. Likewise, the Texas Court of Criminal Appeals observed:

> Holding song lyrics to their literal meaning would lead to the following conclusions: Freddie Mercury "killed a man," Bob Marley "shot the sheriff," Macy Gray "committed murder and . . . got away," the band formerly known as The Dixie Chicks killed Earl, and classically, Johnny Cash "shot a man just to watch him die." These are conclusions we cannot accept outside of some other evidence demonstrating the lyrics are something more than fiction.

Hart, 688 S.W.3d at 894-95 (footnotes omitted) (citations omitted). Nevertheless, as relevant in the Defendant's case, "'[r]ap lyrics are more likely to be found probative and admitted at trial when they mirror the charged crime(s) or describe activity that resembles aspects of the central crime(s) alleged.'" Britton, 710 S.W.3d at 207 (quoting Williams, 663 F. Supp. 3d at 1134).

In addition to factors regarding the inflammatory nature and the probative value of the evidence, other factors that a trial court may consider when determining the admissibility of "artistic expression" evidence include, but are not limited to, whether this evidence is cumulative to other evidence the State will admit at trial, whether admission of this evidence will unduly delay the trial, whether this evidence was created close in time to the offense, and whether the evidence exhibits an unmistakable connection to the charged offense. Id. at 208 n.1 (citing Williams, 663 F. Supp. 3d at 1132-1158).

First, we acknowledge that the rap lyrics admitted in this case presented a serious risk of inflaming the jurors and of influencing them to convict the Defendant on improper grounds. The Defendant's lyrics are highly inflammatory; they include the use of the N-word and profanity and contain language and imagery of guns, violence, and murder. See id. at 208 (citing United States v. Gamory, 635 F.3d 480, 493 (11th Cir. 2011) (concluding that the minimal probative value of the rap video was substantially outweighed by the video's unfair prejudice in part because the lyrics included references to "violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle"); Williams, 663 F. Supp. 3d at 1134 (stating that the rap video and songs were "highly inflammatory" and their admission created a "serious risk of prejudice" because they contained "language and imagery related to drugs, gun crime, violence, and misogyny" and the lyrics were "filled with profanity and use of the N-word"); United States v. Williams, No. 3:13-cr-00764-WHO-1, 2017 WL 4310712, at *7 (N.D. Cal. Sept. 28, 2017) (noting that the videos at issue depicted "images of young African-American men, guns, and drugs atop musical lyrics that denigrate other African-Americans, women, and cooperating witnesses," which were "highly inflammatory" and might "arouse an emotional response, evoke a sense of horror, or appeal to an instinct to punish"). Accordingly, we must consider the inflammatory nature of the Defendant's rap lyrics when determining whether they were properly admitted.

Second, we appreciate that the probative value of these rap lyrics is substantial because the lyrics so closely mirror the facts in this case. Cf. Skinner, 95 A.3d at 252 ("[A]bsent such a strong nexus to defendant's charged crime, his fictional expressive writings are not properly evidential."); Commonwealth v. Gray, 978 N.E.2d 543, 560 (Mass. 2012) (concluding that the rap video, which was offered to prove the defendant's gang membership, should have been excluded because "[t]he lyrics show[ed] no connection to the defendant that would suggest they were biographical or otherwise indicative of his own motive or intent at the time of the shooting"). In Hart, the Texas Court of Criminal Appeals emphasized that there must be proof showing that the lyrics are representative of the Defendant's character or are relevant to the charged offense:

"[W]e don't convict people for murder simply because they have written lyrics about murder." Stuckey, 253 F. Appx. at 483. . . . Here, the State did not offer

anything demonstrating that the lyrics and video were somehow representative of Appellant's character in that they applied outside of the artistic rendering, nor did they demonstrate that, even if they had some real-world application, it was relevant to the charged offense."

Hart, 688 S.W.3d at 896.

Here, the State presented considerable proof that all the admitted lyrics were written by the Defendant and that these lyrics were autobiographical. The lyrics found in the Defendant's jail cell, where only the Defendant was housed, were clearly written by him after the after the victim was fatally shot. Cf. Bey, 2017 WL 1547006, at *7 (noting that "the probative value of the rap videos and lyrics is further undercut by the fact that they are undated, so there is no indication as to whether Bey created the lyrics close in time to the date of his arrest"). Moreover, the lyrics found in the Defendant's jail cell substantially parallel the lyrics in the two writings found at the Rifle Range Road residence, where the Defendant was arrested. The first writing was found in the bedroom attached to the closet where the Defendant was hiding at the time of his arrest. The second writing was found in a backpack in the living room, which also contained a first aid kit and credit cards in Jeanty's name. We agree with the State that because these two writings were found in the residence where the Defendant was hiding after his return from New Jersey and were near materials indicating that he was on the run and was still applying first-aid suggests that these writings were penned by the Defendant while he was in New Jersey or shortly after his return.

Together, the lyrics in these three writings mirror the following facts in this case: the Defendant was shot "in the leg"; the Defendant's name and photograph were "on the news" during the investigation because they wanted the Defendant "for a body"; Ivey "opened up her mouth" to disclose the crimes to law enforcement; the murder weapon was determined to be "Glock"; the murder weapon was "dump[ed]" and never recovered; the victim's Chevy Blazer was "dump[ed]" when it was abandoned in Viriginia; Jayda and Jordan, and later Ivey, failed to "keep it solid" because they talked about these crimes; there were no "social media" Facebook messages concerning the crimes between the Defendant, Ivey, Jeanty, Jayda, or Jordan; and the Defendant "hit the road" and stayed with his "cousin" in "NJ" or "New Jersey" after the victim was shot. We agree with the trial court that although all the lyrics in these writings did not "completely line up" with the facts in this case, there were "sufficient facts" for "a reasonable juror" to look at the lyrics and determine that the Defendant was "recounting a historical event that he was involved in." See Britton, 710 S.W.3d at 207 (reiterating that rap lyrics are more likely to be found probative and admitted at trial when they mirror the charges crimes). We also agree with the trial court that the rap lyrics were "highly probative" because they were "tantamount to a confession" by the Defendant and that "any danger of unfair prejudice" was "outweighed by that probative value."

Although the Defendant contends that the State used the lyrics in these writings during its closing argument to attack his character, rather than to corroborate Ivey's testimony, we disagree. In the State's initial closing, just before reciting the lyrics, the prosecutor stated, "In a moment, you are going to hear further corroboration of Kendra Ivey's testimony identifying the defendant and implicating the defendant in the various events that unfolded in relation to this murder." The prosecutor then recited the lyrics, fulfilling her assurance that the jury would hear corroboration of Ivey's testimony. Moreover, during the State's rebuttal closing argument, the prosecutor painstakingly connected many of the lyrics to the other evidence presented in this case. Given the record, we conclude that the Defendant is not entitled to relief on his claim that the lyrics were used by the State during closing to attack his character, rather than to corroborate Ivey's testimony and to establish the elements of the charged offenses.

We recognize that the trial court provided the following instruction in its jury charge regarding these three writings:

> [A]dmission against interest.
>
> Evidence has been introduced in this trial of a statement or statements by the defendant made outside the trial to show an admission against interest. An admission against interest is a statement by the defendant which acknowledges existence or truth of some fact necessary to be proven to establish the guilt of the defendant, or which tends to show guilt of the defendant, or is evidence of some material fact, but not amounting to a confession.
>
> While this evidence has been received, it remains your duty to decide if, in fact, such statement was ever made. If you believe a statement was not made by the defendant, you should not consider it. If you decide the statement was made by the defendant, you must judge the truth of the fact[s] stated.
>
> In so determining, consider the circumstances under which the statement was made. Also, consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must now, however, arbitrarily disregard any part of any statement, but, rather, should consider all of any statement you believe was made and is true.
>
> You are the sole judge of what weight should be given such a statement. If you decide a statement was made, you should consider it with

all the other evidence in the case in determining the defendant's guilt or innocence.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.11. This court presumes that the jury follows the trial court's instructions. State v. Harbison, 539 S.W.3d 149, 163 (Tenn. 2018); State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

Despite their inherently inflammatory nature, we cannot deny that the rap lyrics, which mirrored detailed facts concerning the crimes and were written close in time to the offense, had a high probative value that was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. At the very least, the trial court's decision to admit these writings containing the lyrics was a reasonable choice among several acceptable alternatives. See Lee Med., 312 S.W.3d at 524. Accordingly, we are constrained to conclude that the trial court did not abuse its discretion in admitting these lyrics in the Defendant's case.

**III.** **Amendment of Presentment.** The Defendant contends that the trial court committed plain error in allowing the State to amend Count 5 charging especially aggravated robbery the morning of trial. He asserts that although the State had nearly two years to amend the presentment, it waited until the morning of his trial to seek amendment of this count. He also asserts that while the State did not have to identify the item stolen in Count 5, it chose to identify it, and then sought a late amendment of this count, which prejudiced his right to proper notice of the charges against him, his right to present a defense, and his right to a fair trial. In response, the State argues that the trial court did not commit plain error in allowing the amendment of the presentment, to which the Defendant explicitly consented. We agree with the State.

On February 24, 2021, the Knox County Grand Jury returned a presentment charging the Defendant with murder and related felonies. The Defendant's trial began February 21, 2023. The morning of trial, just prior to jury selection, the State made an oral motion to amend the presentment by changing the property taken in Count 5 from a wallet to a cell phone and a Chevy Blazer. Defense counsel confirmed with the trial court that this amendment removed the wallet as the property taken in Count 5 and replaced it with a cell phone and the Chevy Blazer. Defense counsel then clearly stated, "That's fine, Judge," when referencing this amendment. The trial court then granted the State's motion to amend Count 5.

At the motion for new trial hearing, the trial court noted that although the State had initially listed the property taken in Count 5 as a wallet, it believed the this was "probably surplusage" because it did not believe the State needed to specifically include the property taken in the charge. The court also noted that when the State asked to amend this charge,

defense counsel did not object. Ultimately, it held that it did not believe it was plain error for the court to allow the State to change "that surplusage in the [presentment] from a wallet to a cell phone and Chevy Blazer."

Tennessee Rule of Criminal Procedure 7(b)(1) provides that "[w]ith the defendant's consent" a trial court "may amend an indictment, presentment, or information." For a presentment to be amended pursuant to Rule 7(b)(1), "an oral or written motion to amend should be made, and the defendant's oral or written consent to the motion must be clear from the record." State v. Stokes, 24 S.W.3d 303, 307 (Tenn. 2000).

Here, the record clearly shows that the Defendant consented to the amendment of Count 5 of the presentment. Nevertheless, the Defendant claims the trial court's amendment of this count constitutes plain error. This court has recently questioned the availability of plain error review "when the error asserted on appeal was affirmatively invited by the defendant in the trial court." State v. Garrens, No. W2024-00258-CCA-R3-CD, 2025 WL 1307696, at *9 n.6 (Tenn. Crim. App. May 6, 2025); see State v. Harris, No. W2015-00500-CCA-R3-CD, 2016 WL 2594964, at *7 (Tenn. Crim. App. May 3, 2016); State v. Towry, No. 01C01-9310-CC-00363, 1994 WL 168738, at *4 (Tenn. Crim. App. May 5, 1994)).

In any case, the Defendant is not entitled to plain error relief. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). For this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283.

Rule 7(b) clearly permits a trial court to amend a charging instrument if the defendant consents. Tenn. R. Crim. P. 7(b)(1). In addition, this rule places no limitations on the court's ability to amend with the defendant's consent. The Defendant has failed to show that a clear and unequivocal rule of law was breached or that consideration of the error is

- 40 -

"necessary to do substantial justice" when the trial court followed Rule 7(b). Because the Defendant has failed to establish all five factors with regard to this issue, he is not entitled to plain error relief.

    **IV. <u>Hearsay within Hearsay.</u>** The Defendant argues that the trial court erred in allowing Ivey to testify to hearsay within hearsay at trial. He notes that although the trial court made a finding on the statement from Ivey's sister to Ivey, which was the first level of hearsay, the trial court never made a finding on the alleged statements from Jayda Martinez and Jordan Franklin to Ivey's sister. The Defendant also claims the trial court compounded this error by failing to instruct the jury that it was not to consider these statements for the truth of the matter asserted and by the State's improper closing argument. In response, the State argues that the testimony in question was not hearsay because it was introduced to show its effect on Ivey, not for the truth of the matter asserted. We agree with the State.

    In determining whether a statement is hearsay and, if so, whether it fits within one of the hearsay exceptions, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." <u>Kendrick v. State</u>, 454 S.W.3d 450, 479 (Tenn. 2015) (citing <u>State v. Gilley</u>, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review." <u>Id.</u> (citing <u>State v. Schiefelbein</u>, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); <u>Keisling v. Keisling</u>, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Clearly, if a statement is not offered to prove the truth of the matter asserted, then it is not hearsay. In addition, there are numerous exceptions to the hearsay rule. Tenn. R. Evid. 803, 804.

    A statement offered to show its effect on the listener is not a hearsay statement. <u>State v. Venable</u>, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980). In addition, if an out-of-court statement contains multiple levels of hearsay, often referred to as "hearsay within hearsay," the statement is not admissible unless each level fits within a hearsay exception. Tenn. R. Evid. 805.

    At trial, Ivey was asked why she and the Defendant "went on the run" after committing this homicide and then decided to "come right back." Ivey replied, "When I had spoken to my sister, she had said that she had spoken to Jayda and Jordan, they had

- 41 -

r[u]n into each other at a hotel room—." Defense counsel immediately objected, and the trial court sustained the objection. The prosecutor then instructed Ivey not to tell him what Jayda and Jordan said and then asked Ivey if she talked to her sister. When Ivey said that she had, the prosecutor asked, "You received information from your sister about Jayda—that might be—Jayda and Jordan; is that correct?" Defense counsel again objected.

The trial court then interjected: "Well, it's not really offered to prove the truth of the matter asserted. What I think the State is looking at is, why did you come back here? Was it—you had a conversation with your sister and decided to come back, is that right, or am I reading into that?" Ivey replied, "Yes." The trial court announced to the parties, Ivey, and the jury, "I'm going to allow you to say what somebody else told you. Not for the purposes, folks, or what was told to her, but just to show why she did what she did. What was said to you by your sister that made you want to come back to Knoxville?" Ivey then testified:

> My sister [Kendall] had said that she had r[u]n into Jordan and Jayda and they had told her that me and [the Defendant] had shot somebody, killed somebody and we had to leave town. So we then called Jordan and Jayda. They denied that they ever said that. So from that point on, we decided that we needed to come back to Tennessee to see what everybody knew or—get to the bottom of what was really go—whatever—try to ease everything out, I guess you could say.

When considering this issue at the motion for new trial hearing, the trial court held that while it may not have specifically addressed the "double hearsay issue," it did not recall defense counsel making a second objection to "hearsay within hearsay." The court asserted that it made a statement to the jury indicating that it was allowing this proof to show Ivey's reaction, although it acknowledged that it may not have been the court's "best instruction ever." Nevertheless, the trial court said it believed it made the correct ruling because the evidence was presented "not to prove the truth of the matter asserted, but to show why Ms. Ivey did what she did, and what [Ivey and the Defendant] did after this phone call." The court also asserted that if the admission of this evidence was error, it was "harmless error" in light of the other evidence, Ivey's testimony, and the Defendant's journal entries.

The Defendant asserts that the prejudicial impact of Ivey naming Jayda and Jordan as the source of this rumor "lent unjustifiable credibility to Ivey's testimony that [Jayda and Jordan] were involved in the cleanup efforts after [the victim's] death." He notes that the lead detective testified that he interviewed Jayda and Jordan on February 18, 2021, but did not charge either of these individuals with crimes related to the victim's death. He claims this detective also seized the phones belonging to Jayda and Jordan, but the State did not

- 42 -

introduce proof from these phones, which suggests that there was no relevant or corroborating evidence found on these phones.

The Defendant also claims that the trial court compounded this error by failing to instruct the jury that it was not to consider this statement for the truth of the matter asserted and by the State's improper closing argument. He claims that the "[i]n determining whether Ivey's accomplice testimony was sufficiently corroborated, the jury was told by the State that they could consider Ivey's improper testimony that [Jayda and Jordan] told Ivey's sister that the Defendant and Ivey killed someone." He asserts that the "precise impact on the jury's determination is unknown, but any consideration of improperly admitted evidence was not harmless error."

We agree that there were two different statements contained within Ivey's testimony above. The first statement was what Kendall said to Ivey, and the second statement was what Jordan and Jayda said to Kendall. Both of these statements were introduced to explain why Kendall and then Ivey took a specific action. Specifically, the admission of Jayda and Jordan's statements to Kendall explained why Kendall mentioned them to Ivey, and the admission of Kendall's statement to Ivey explained why Ivey and the Defendant, who had successfully fled to New Jersey, returned to Tennessee. This particular statement was admitted to explain Ivey's and the Defendant's behavior in returning to Tennessee, not to verify that Jordan and Jayda's statements about the murder were true. Accordingly, the trial court properly introduced these statements as non-hearsay because they were not introduced to prove the truth of the matter asserted.

**V. Discovery Request.** The Defendant claims the trial court abused its discretion in denying his "Specific Discovery Request No. 1," requesting materials necessary for his state-funded expert to complete her work. He asserts that the State's approximately nine-month delay in objecting to this discovery request unnecessarily prolonged the proceedings and required the trial court to consider the nearly three-and-a-half-year delay between the date of the offense and the motion for new trial hearing. The Defendant argues that if the State had filed a timely response to this discovery request, the issue could have been litigated at or before his September 29, 2023 sentencing hearing. He also contends that the trial court erred in denying his expert the materials needed to complete her work after granting funding for this expert. In response, the State asserts that because the documents/items requested in this specific discovery request were "not material to any ground ultimately pursued in the motion for new trial," the trial court properly exercised its discretion in denying the request. We agree with the State.

On August 8, 2023, the Defendant filed an ex parte motion authorizing the hiring of a forensic biology consultant for the purpose of assisting defense counsel in reviewing police and crime scene documentation; in reviewing crime laboratory, forensic serology,

and DNA reports and in interpreting these results; and in reviewing transcripts. The same day, the trial court granted the motion and entered an order authorizing the hiring of Samantha Spencer as a forensic biology consultant for the Defendant. On August 21, 2023, the Defendant filed his "Specific Discovery Request No. 1," claiming that the following discovery materials were material to the preparation of his defense: (1) complete forensic case file/laboratory file/master file; (2) all documents produced by the Crime Scene Investigation Unit and/or Violent Crime Response Team; (3) all laboratory policies/procedures/protocols covering the entire period of testing and analysis; (4) competency documents concerning all forensic personnel; and (5) quality documents. In this discovery request, the Defendant argued that the requested materials were not found in the previous discovery disclosures, were material to preparing his defense, and were referenced in other discovery materials, which demonstrated that the requested materials were in the State's possession, custody, or control. On May 1, 2024, the State filed a response, arguing that the Defendant's discovery request should be denied "without an offer of proof from the defendant demonstrating the materiality of the requested materials."

On May 10, 2024, the trial court entered an order denying the Defendant's motion for "Specific Discovery Request No. 1." In it, the court noted that at trial, the State introduced DNA proof and complied with pre-trial discovery requests concerning DNA testing. The court observed that the Defendant was considering including a claim of ineffectiveness of counsel in his motion for new trial and had obtained a DNA expert, who wished to review all documentation and procedures followed by law enforcement and the testing agency to determine if any errors were made or if the DNA evidence could have been further challenged at trial. The trial court held that it had reviewed the specific items requested in the "Specific Discovery Request No. 1" and determined that the requested information was not material. The court noted that the Defendant's motion for new trial did "not include any allegations of ineffective assistance of counsel" or "any challenges to court rulings regarding DNA evidence." It also noted that the Defendant had "failed to present affidavits or testimony by the defense expert as to why . . . she need[ed] the requested information." Ultimately, the court held that the requested information was not subject to discovery because "there ha[d] been no showing of materiality in the requested information." However, the court noted that the Defendant could "choose to re-raise this issue in a petition for post-conviction relief or, if he so chooses, in an amended motion for new trial alleging ineffective assistance of counsel in relation to the DNA evidence along with supporting evidence of materiality."

Thereafter, the Defendant's appellate counsel filed a "Motion to Reconsider the Specific Discovery Request No. 1" along with an affidavit from its expert explaining the materiality of the requested information in the Defendant's motion for new trial, which would include a claim for ineffectiveness of counsel.

On June 24, 2024, the date of the motion for new trial hearing, the trial court first considered the motion to continue filed by the Defendant's appellate counsel, which sought additional time to obtain further assistance from the expert on the ineffective assistance of counsel claim prior to the motion for new trial hearing. The State asserted that after talking to the Defendant's attorney, he believed she would not proceed on the ineffective assistance of counsel claim if the trial court denied the motion to continue. Consequently, the State requested that the trial court proceed on the motion for new trial hearing, recognizing that the ineffective assistance of counsel claim could be raised after the conclusion of the direct appeal.

At that point, the Defendant's attorney asked the trial court to address the "Motion to Reconsider the Specific Discovery Request No. 1," arguing that although the discovery request would relate to the ineffective assistance of counsel claim, it would also relate to the sufficiency of the evidence issue. She also stated that it was her understanding at the May 2024 court date that the parties and court agreed that if she raised the ineffective assistance of counsel claim at this stage, then the parties would need a new hearing date for the motion for new trial that accommodated trial counsel's schedule. She stated that because she believed her motion for a continuance would be granted, she had not subpoenaed several witnesses, including the medical examiner who performed the victim's autopsy and the defense's new expert Samantha Spencer, for the motion for new trial hearing. However, the Defendant's attorney acknowledged that if the trial court was going to deny the specific discovery request or the motion to continue, then she would strike the ineffective assistance of counsel claim from her motion for new trial. The prosecutor noted that if the parties went forward with the motion for new trial hearing that day, the Defendant would still have an opportunity to call those witnesses and pursue the ineffective assistance claim at a later time. The trial court agreed, finding that the additional defense witnesses related to the ineffective assistance of counsel claim rather than the sufficiency of the evidence claim, which was limited to the proof presented at trial. The court noted that if the ineffective assistance claim was withdrawn from the motion for new trial, the remaining issues could be addressed without the need for the additional defense witnesses who were not subpoenaed to testify that day. It also recognized that the Defendant would not be prejudiced by the decision to strike the ineffective assistance of counsel claim because the appellate court often raised new ineffective assistance of counsel claims in their opinions. The trial court then stated that it was denying the renewed motion to reconsider the specific discovery request No. 1 and the motion to continue and held that it would proceed on the motion for new trial on that date. When the trial court asked if Defendant's attorney wanted to withdraw the ineffective assistance of counsel claim from the motion for new trial, she replied affirmatively. Thereafter, the trial court denied the motion to reconsider and the motion to continue, and Defendant's appellate counsel withdrew the claim of ineffective assistance of counsel and proceeded on the remaining claims in the motion for new trial.

At the conclusion of the motion for new trial hearing, the trial court reiterated that it had denied the "Motion to Reconsider the Specific Discovery Request No. 1" because it was relevant to the ineffective assistance of counsel claim, which Defendant's counsel withdrew. The court noted that "if needed," the ineffective assistance claim could be "addressed later." The court also stated, "I don't think it really has much of an impact here on what we've done, other than my denial of the request for a continuance of this hearing, which [defense counsel] can . . . raise . . . as well, I think."

Rule 16 provides that a defendant may obtain documents and objects from the State if they are "material to preparing the defense[.]" Tenn. R. Crim. P. 16(a)(1)(F)(i). In addition, a defendant may obtain copies of the results of any scientific tests or experiments if the results are "material to preparing the defense[.]" Tenn. R. Crim. P. 16(a)(1)(G)(iii). A trial court's decision granting or denying a discovery request is reviewed for an abuse of discretion. Lee Med., 312 S.W.3d at 524.

We agree that the materials requested in the specific discovery request were "not material to any ground pursued in the motion for new trial. While the requested materials might have allowed the Defendant to undercut some of the State's trial proof, it would not have affected the other issues raised in the motion for new trial, including the sufficiency of the evidence. Accordingly, we conclude that the trial court did not abuse its discretion in denying the specific discovery request.

**VI.** **Cumulative Error.** Although the Defendant contends that each of the aforementioned errors entitles him to a new trial, he also argues that the cumulative effect of these alleged errors also deprived him of a fair trial. The State counters that the Defendant has not established multiple errors required to support a cumulative error claim. We agree with the State.

With regard to this issue at the motion for new trial hearing, the trial court stated that "the only possible error was the double hearsay issue," and that this issue was "certainly harmless if it was error." The cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Because we have concluded that there were no errors committed during the trial proceedings in this case, the Defendant is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

- 46 -

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.


s/ **_Camille R. McMullen_**
CAMILLE R. MCMULLEN, JUDGE